JUDGE FORREST

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

14 CV          431

---------------------------------------x

FIDELITY NATIONAL FINANCIAL, INC.,

      Plaintiff,

         vs.

NATIONAL UNION FIRE INSURANCE CO. OF PITTSBURGH, PA.,

CERTAIN UNDERWRITERS AT LLOYD'S LONDON, BEAZLEY FURLONGE LTD. (SYNDICATE #2623) AND BEAZLEY FURLONGE LTD. (SYNDICATE #623),

INDIAN HARBOR INSURANCE COMPANY,

ILLINOIS NATIONAL INSURANCE COMPANY,

      and

IRONSHORE SPECIALTY INSURANCE COMPANY,

      Defendants.

---------------------------------------x

Case No. _____

Jury Trial Demanded

**COMPLAINT**

Civil Action

RECEIVED
JAN 2 4 2014
U.S.D.C. S.D. N.Y.
CASHIERS

## COMPLAINT

For its Complaint against Defendants National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union"), Certain Underwriters at Lloyd's London, Beazley Furlonge Ltd. (Syndicate #2623) and Beazley Furlonge Ltd. (Syndicate #623) (collectively "Beazley"), Indian Harbor Insurance Company ("Indian Harbor"), Illinois National Insurance Company

1

("Illinois National"), and Ironshore Specialty Insurance Company ("Ironshore") (collectively "the Defendants" unless otherwise noted), Plaintiff Fidelity National Financial, Inc. ("FNF") alleges as follows:

## INTRODUCTION

1.      This is a breach of contract, declaratory judgment, and equitable action arising from the Defendants' wrongful refusal to pay all – or alternatively, a part – of a multi-million dollar loss under certain Miscellaneous Professional Liability ("MPL") insurance policies covering that loss.

## THE PARTIES

2.      FNF is a Delaware corporation, with its principal place of business in Jacksonville, Florida.

3.      National Union is a Pennsylvania corporation, with its principal place of business in New York, New York, does business in the State of New York and in this Judicial District, and is an AIG affiliated company.

4.      Beazley are foreign entities, are specific individual underwriting syndicates that do business at Lloyd's in London, have their principle place of business in London, England, and do business in the State of New York and in this Judicial District.

5.      Indian Harbor is a North Dakota corporation, with its principal place of business in Stamford, Connecticut, and does business in the State of New York and in this Judicial District.

6.      Illinois National is an Illinois corporation, with its principal place of business in Chicago, Illinois, does business in the State of New York and in this Judicial District, and is also an AIG affiliated company.

2

7.      Ironshore is an Arizona corporation, with its principal place of business in New York, New York, and does business in the State of New York and in this Judicial District.

## JURISDICTION AND VENUE

8.      Subject matter jurisdiction exists pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interests and costs, and because there is complete diversity.

9.      Venue is proper pursuant to 28 U.S.C. § 1391 because the Defendants are each subject to this Court's personal jurisdiction.

## FACTS GIVING RISE TO THIS SUIT

### (FNF's Risk Management Program)

10.     FNF is a publicly-traded company with over 270 direct / indirect subsidiaries.

11.     In recognition of the impracticability of having each of its subsidiaries being independently responsible for procuring insurance and reporting and managing claims submitted to insurers, FNF manages both its and its subsidiaries' risk management insurance portfolio through FNF's Risk Management Department.

12.     Toward this end, FNF procures various types of insurance, as well as reinsurance. Pertinent here are the MPL Program and the Reinsurance Program.

13.     Such programs not only provided coverage to FNF, but also to its subsidiaries, including Chicago Title Insurance Company ("Chicago Title"), which is a Nebraska corporation with its principal place of business in Florida.

3

**(The MPL Program)**

14.     An MPL Program consists of building a "tower of insurance", consisting of a primary policy and excess policies that are specifically excess to the primary policy and, as the case may be, other excess policies within that tower.

15.     Relevant "MPL Towers" in this action are the "2009-2010 MPL Tower" and the "2010-2011 MPL Tower".

**(The 2009-2010 MPL Tower)**

16.     The 2009-2010 MPL Tower consisted of: National Union, as the primary carrier; Beazley as the first excess carrier; Indian Harbor as the second excess carrier; National Union, as the third excess carrier; and Ironshore as the fourth excess carrier.

17.     More specifically, National Union issued the primary Miscellaneous Professional Liability Policy, bearing Policy Number 01-351-34-64, a true and accurate copy of which is attached hereto as Exhibit A (the "2009-2010 Primary MPL Policy"). The 2009-2010 Primary MPL Policy has a $15 million aggregate and per claim limit, subject to a $5 million retention, but because National Union paid on another claim under the 2009-2010 Primary MPL Policy, the available limit under the 2009-2010 Primary MPL Policy is $12,057,548.68.

18.     Beazley issued an excess policy bearing Policy Number B080113851P09 (the "2009-2010 First Excess MPL Policy"), with a policy limit of $15 million and specifically written as excess to the 2009-2010 Primary MPL Policy. A true and accurate copy of the 2009-2010 First Excess MPL Policy is attached hereto as Exhibit B.

19.     Indian Harbor issued an excess policy bearing Policy Number ELU114673-09 (the "2009-2010 Second Excess MPL Policy"), with a policy limit of $10 million and specifically written as excess to the 2009-2010 Primary MPL Policy and the 2009-2010 First

4

Excess MPL Policy.  A true and accurate copy of the 2009-2010 Second Excess MPL Policy is attached hereto as Exhibit C.

20.     National Union also issued an excess policy bearing Policy Number 01-363-54-80 (the "2009-2010 Third Excess MPL Policy"), with a policy limit of $10 million and specifically written as excess to the 2009-2010 Primary MPL Policy, the 2009-2010 First Excess MPL Policy, and the 2009-2010 Second Excess Policy.  A true and accurate copy of the 2009-2010 Third Excess MPL Policy is attached hereto as Exhibit D.

21.     Ironshore issued an excess policy bearing Policy Number 000014500 (the "2009-2010 Fourth Excess MPL Policy"), with a policy limit of $10 million and specifically written as excess to the 2009-2010 Primary MPL Policy, the 2009-2010 First Excess MPL Policy, the 2009-2010 Second Excess Policy, and the 2009-2010 Third Excess Policy.  A true and accurate copy of the 2009-2010 Fourth Excess MPL Policy is attached hereto as Exhibit E.

22.     FNF is the named insured under the above-referenced policies making up the 2009-2010 MPL Tower.

23.     Chicago Title is an insured under the above-referenced policies making up the 2009-2010 MPL Tower.

**(The 2010-2011 MPL Tower)**

24.     As the 2009-2010 MPL Tower was nearing its expiration, FNF sought to renew it. Ultimately, the 2010-2011 MPL Tower was renewed and it consisted of: National Union, as the primary carrier; Beazley as the first excess carrier; Indian Harbor as the second excess carrier; Illinois National as the third excess carrier; and Ironshore as the fourth excess carrier.

25.     More specifically, National Union issued the primary Miscellaneous Professional Liability Policy, with an aggregate and per claim limit of $15 million, subject to a $5 million

5

retention, and bearing Policy Number 01-318-41-31, a true and accurate copy of which is attached hereto as Exhibit F (the "2010-2011 Primary MPL Policy").

26.     Beazley issued an excess policy bearing Policy Number B080113851P10 (the "2010-2011 First Excess MPL Policy"), with a policy limit of $15 million and specifically written as excess to the 2010-2011 Primary MPL Policy.  A true and accurate copy of the 2010-2011 First Excess MPL Policy is attached hereto as Exhibit G.

27.     Indian Harbor issued an excess policy bearing Policy Number ELU119552-10 (the "2010-2011 Second Excess MPL Policy"), with a policy limit of $10 million and specifically written as excess to the 2010-2011 Primary MPL Policy and the 2010-2011 First Excess MPL Policy.  A true and accurate copy of the 2010-2011 Second Excess MPL Policy is attached hereto as Exhibit H.

28.     Illinois National issued an excess policy bearing Policy Number 01-329-78-71 (the "2010-2011 Third Excess MPL Policy"), with a policy limit of $10 million and specifically written as excess to the 2010-2011 Primary MPL Policy, the 2010-2011 First Excess MPL Policy, and the 2010-2011 Second Excess Policy.  A true and accurate copy of the 2010-2011 Third Excess MPL Policy is attached hereto as Exhibit I.

29.     Ironshore issued an excess policy bearing Policy Number 000014501 (the "2010-2011 Fourth Excess MPL Policy"), with a policy limit of $10 million and specifically written as excess to the 2010-2011 Primary MPL Policy, the 2010-2011 First Excess MPL Policy, the 2010-2011 Second Excess Policy, and the 2010-2011 Third Excess Policy.  A true and accurate copy of the 2010-2011 Fourth Excess MPL Policy is attached hereto as Exhibit J.

30.     FNF is the named insured under the above-referenced policies making up the 2010-2011 MPL Tower.

31.     Chicago Title is an insured under the above-referenced policies making up the 2010-2011 MPL Tower.

### (MPL Policy Language)

32.     The Insuring Agreements in the 2009-2010 Primary MPL Policy and the 2010-2011 Primary MPL Policy (collectively the "MPL Primary Policies" unless otherwise noted) are the same and provide, in relevant part, as follows:

    I.     **INSURING AGREEMENTS**

        A.     **ERRORS AND OMISSIONS**

> We shall pay on **your** behalf those amounts, in excess of the retention, **you** are legally obligated to pay as **damages** resulting from a claim <u>first made</u> against **you** <u>and reported to us</u> during the **policy period** or Extended Reporting Period (if applicable) for **your wrongful act** in rendering or failing to render **professional services** for others, but only if such **wrongful act** first occurs on or after the **retroactive date** and prior to the end of the **policy period.**

        B.     **DEFENSE**

>     1.     We have the right and duty to defend a **suit** brought against **you** alleging a **wrongful act** even if the **suit** is groundless, false or fraudulent . . .

(MPL Primary Policies, §I) (bold in the original, underline emphasized added).

33.     The term "**wrongful act**" is defined as "any actual or alleged negligent act, error or omission, misstatement, or misleading statement committed solely in **your** performance of **professional services**." (MPL Primary Policies, §II. Q) (bold in the original).

34.     Endorsement #10 to the MPL Primary Policies describes when a claim is considered "first made". In particular, "a **claim**" is "'first made' at such time that the **claim** <u>is known by **your** General Counsel, Risk Manager or Chief Financial Officer</u>." (MPL Primary Policies, Endorsement #10, ¶A (1)) (bold in the original, underline emphasis added).

35.     The MPL Primary Policies do not require reporting of a claim after it has been "first made", as that phrase is defined.

36.     Instead, the MPL Primary Policies provide, in relevant part, as follows:

> (2) Before coverage will apply for any **claim** <u>first made</u> against you during the **policy period** or the Extended Reporting Period (if applicable) <u>for which total **damages** and **claim expenses** incurred in connection with any such claim exceed, or are reasonably estimated by any of the individuals referenced in subparagraph (1) above, to exceed $2,500,000,</u> you shall, as a condition precedent to **our** obligations under this policy, give **us** written notice as soon as practicable of any such **claim** with full particulars . . . .

> (3) Before coverage will apply for any **claim** <u>first made</u> against you during the **policy period** or the Extended Reporting Period (if applicable) <u>for which total **damages** and **claim expenses** incurred in connection with any such claim are reasonably estimated by any of the individuals referenced in subparagraph (1) above to be in excess of $500,000, but not more than $2,500,000, **you** shall provide written notice to **us** of such **claim**(s) on a quarterly basis in the form of a bordereau.</u> . . .

(MPL Primary Policies, Endorsement #10, ¶A) (bold in the original, underline emphasis added).

37.     Additionally, the MPL Primary Policies provide for a "Post-Policy Reporting Period."

38.     For example, Endorsement #10 of the 2009-2010 Primary MPL Policy provides, in relevant part:

> (4)     Notice of the claims described in subparagraphs (2) and (3) above can be made either:

> a.      anytime during the **policy period**, or during the Extended Reporting Period (if applicable); or

> b.      <u>within sixty (60) days after the end of the **policy period**,</u> as long as such **claim**(s) is reported no later than sixty (60) days after the date of such **claim** was first made against you (referred to herein as the "Post Policy Reporting Period").

(Bold in the original, underline emphasis added).

8

39.     The "Policy Period" for the 2009-2010 Primary MPL Policy was November 18, 2009 to November 18, 2010, at 12:01 A.M. Eastern Standard Time.  Sixty days after November 18, 2010, 12:01 A.M. Eastern Standard Time is – and thus the Post-Policy Reporting Period for the 2009-2010 Primary MPL Policy expired on – January 17, 2011 at 12:01 A.M. Eastern Standard Time.

40.     The 2009-2010 First Excess MPL Policy, the 2009-2010 Second Excess MPL Policy, the 2009-2010 Third Excess Policy, and the 2009-2010 Fourth Excess Policy (collectively, the "2009-2010 Excess MPL Policies") "follow form" to the 2009-2010 Primary MPL Policy.

41.     All the terms as described above in Paragraphs 32-39 are the same in the 2009-2010 Excess MPL Policies.

42.     Given the Post-Policy Reporting Period, the 2009-2010 Primary MPL Policy and the 2009-2010 Excess MPL Policies, expired on January 17, 2011, at 12:01 A.M. Eastern Standard Time.

43.     Given the Post-Policy Reporting Period, the Defendants could not "close their books" on their respective policies making up the 2009-2010 MPL Tower until January 17, 2011, at 12:01 A.M. Eastern Standard Time.

44.     The 2010-2011 First Excess MPL Policy, the 2010-2011 Second MPL Policy, the 2010-2011 Third Excess Policy, and the 2010-2011 Fourth Excess Policy (collectively, the "2010-2011 Excess MPL Policies") "follow form" to the 2010-2011 Primary MPL Policy.

45.     All the terms as described in Paragraphs 32-37 are the same in the 2010-2011 Excess MPL Policies.

46.     The "Policy Period" for the 2010-2011 MPL Tower was November 18, 2010 to November 18, 2011.

### (The Reinsurance Program)

47.     FNF, together with certain of its subsidiaries, is the largest title insurance company in the United States.

48.     On a yearly basis, FNF purchases reinsurance for itself and its subsidiaries, including Chicago Title.

49.     During the pertinent time period, FNF entered into a First Excess of Loss Reinsurance Contract (the "Reinsurance Contract"). The Reinsurance Contract will be filed subsequently after FNF has the opportunity to obtain leave from the assigned Judge to submit it under seal, since certain terms set forth therein are considered confidential and proprietary for competitive reasons. The Defendants, however, are already in possession of the Reinsurance Contract.

50.     The term of the relevant Reinsurance Contract was November 18, 2010 to November 18, 2011.

51.     The Reinsurance Contract is subject to a $10 million retention and provides coverage for up to $90 million per Loss Occurrence, which is broken out in three layers. The Reinsurance Contract's First Excess Layer provides for $10 million in coverage, the Second Excess Layer provides $30 million in coverage, and the Third Excess Layer provides for $50 million in coverage. A single subscribing reinsurer does not underwrite an entire layer; instead, they each "participate" in a certain percentage of one or more of the layers.

52.    FNF also entered into a Second Excess of Loss Reinsurance Contract covering the same time period as the Reinsurance Contract, but providing certain additional coverage for up to $300 million per Loss Occurrence for losses exceeding $100 million.

**(The MPL Program And Reinsurance Program Are Underwritten Separately)**

53.    Each year, the MPL Program and the Reinsurance Program are negotiated separately and independently of each other.

54.    During their respective underwriting processes regarding, and in calculating the premiums for, their respective MPL policies (which are more fully described in Paragraphs 17-21 and 25-29 above and which will be collectively referred to as the "MPL Policies" unless otherwise noted), the Defendants do not consider the fact that FNF has reinsurance.

55.    FNF pays (and has paid) millions in separate premiums, each year, for the MPL Program and the Reinsurance Program.

56.    The total gross premium (exclusive of Florida taxes) for the 2009-2010 MPL Tower was $7,024,012.00, broken down as follows:  $2,700,000.00 for the 2009-2010 Primary MPL Policy; $2,040,262.00 for the 2009-2010 First Excess MPL Policy; $828,750.00 for the 2009-2010 Second Excess MPL Policy; $780,000.00 for the 2009-2010 Third Excess Policy; and $675,000.00 for the 2009-2010 Fourth Excess MPL Policy.  FNF paid those premiums.

57.    The total gross premium (exclusive of Florida taxes) for the 2010-2011 MPL Tower was $6,257,262.00, broken down as follows:  $2,480,000.00 for the 2010-2011 Primary MPL Policy; $2,067,262.00 for the 2010-2011 First Excess MPL Policy; $710,000.00 for the 2010-2011 Second Excess MPL Policy; $570,000.00 for the 2010-2011 Third Excess Policy; and $430,000.00 for the 2010-2011 Fourth Excess MPL Policy.  FNF paid those premiums.

11

58.     The premiums under the Reinsurance Contract and the Second Excess of Loss Reinsurance Contract are calculated differently and separately and, all told, FNF paid millions in premiums for both.[1]

**(Choice-of-Law)**

59.     All of the MPL Policies, except for the 2009-2010 First Excess MPL Policy and the 2010-2011 First Excess MPL Policy, do not contain a choice of law provision.

60.     Under New York's "center of gravity" or "grouping of contacts" conflict-of-law test, as interpreted and implemented by the Court of Appeals of the State of New York in *Certain Underwriters at Lloyd's London v. Foster Wheeler Corp.*, 36 A.D.3d 17 (NY App. Div. 2006), *aff'd*, 876 N.E.2d 500 (2007), in cases involving liability insurance covering multistate risks and multiple insureds, the law of the named insured's principal place of business governs.

61.     Accordingly, under New York's conflict-of-law test, Florida law applies to all of the MPL Policies not having a choice-of-law provision, because these policies cover multistate risks and multiple insureds and because FNF is the Named Insured, is the entity that accepted those policies, is the entity in charge of those policies, and is headquartered in Jacksonville, Florida.

62.     Because the 2009-2010 First Excess MPL Policy and the 2010-2011 First Excess MPL Policy follow form to the 2009-2010 Primary MPL Policy and the 2010-2011 Primary Policy, respectively, the law of Florida also applies to any coverage related interpretation. In any event, these excess policies do not exclude New York conflict-of-law rules, providing only that, "[t]his contract shall be governed by, and construed in accordance with, the laws of the State of

---

[1]Because the specific amount of the premiums FNF paid relative to the reinsurance contracts is considered confidential and proprietary for competitive reasons, those specific amounts are not listed here.   FNF will confidentially disclose those specific amounts at a later date, after FNF has the opportunity to negotiate a stipulated protective order for the assigned Judge's consideration and approval.

New York." (Exhibits B and G). In contrast, the Reinsurance Contract provides, in relevant part, that "[t]his contract shall be governed as to performance, administration and interpretation by the law of the State of Florida, exclusive of conflict of law rules."

63.     Accordingly, under New York's conflict-of-law rules, the law of Florida would also apply to the 2009-2010 First Excess MPL Policy and the 2010-2011 First Excess MPL Policy because there are multiple insureds and because FNF is the named insured, is the entity that accepted those policies, is the entity in charge of those policies, and is headquartered in Jacksonville, Florida.

### (The Abengoa Loss)

64.     Chicago Title was named as a defendant in the matter styled as *Abengoa Bioenergy of Kansas LLC, et al., v. Chicago Title Insurance Company*, Case No. 08SL-CC03193, Circuit Court of St. Louis County, Missouri (the "Abengoa Matter").

65.     In the Abengoa Matter, the plaintiffs Abengoa Bioenergy U.S. Holding, Inc., Abengoa Bioenergy Corp., and Abengoa Bioenergy of Kansas, LLC (collectively the "Abengoa Plaintiffs" unless otherwise noted), brought claims for negligence, negligent misrepresentation, and breach of contract against Chicago Title for performing a faulty radius search (the "Radius Search") in connection with the Abengoa Plaintiffs' plans to build a new plant in Kansas (the "Plant").

66.     In order to build the Plant, the Abengoa Plaintiffs needed to obtain a rezoning and special use permit from local authorities. To obtain these necessary approvals, the Abengoa Plaintiffs had to first give advance notice to residents living within a certain distance of the proposed Plant. The Radius Search was to identify those residents.

13

67.     Chicago Title requested that one of its agents, Kansas Secured Title & Abstract Company, Inc. ("Kansas Secured"), perform the Radius Search. After Kansas Secured performed that search and provided the results to Chicago Title, Chicago Title reviewed it and then issued a "Certificate", identifying the residents within the area of the Plant and sent the Certificate to the Abengoa Plaintiffs.

68.     The Certificate provided that Chicago Title's liability would be limited to $500.00.

69.     Chicago Title made a mistake in failing to identifying all of the residents within the required distance of the proposed Plant. As a result, the Abengoa Plaintiffs decided to re-start the local authority approval process and eventually approval was granted.

70.     The proposed Plant, however, was subject to general public opposition. So, even though the Abengoa Plaintiffs secured approval from the local authorities following proper notice to all potentially affected residents, certain residents still brought a lawsuit challenging the approval.

71.     The resident litigation was eventually resolved in the Abengoa Plaintiffs' favor but, by that time, the Abengoa Plaintiffs had decided to forego building the Plant in Kansas and opted instead to build a plant in Illinois.

72.     The Abengoa Matter proceeded to trial. Due to a pre-trial motion in limine ruling, Chicago Title was prevented from arguing at trial the enforceability of the Certificate's limitation of liability clause.

73.     At trial, the negligent misrepresentation and breach of contract claims were dropped, but the jury returned a verdict on the negligence count in favor of Abengoa Bioenergy U.S. Holding, Inc., and against Chicago Title, in an amount in excess of $48 million.

14

74.     Chicago Title sought post-judgment relief in the trial court, but without success.

75.     Chicago Title then appealed the verdict to the Missouri Court of Appeals, but the Missouri Court of Appeals affirmed.

76.     Chicago Title then sought review by the Missouri Supreme Court, but on October 30, 2012, the Missouri Supreme Court refused to accept jurisdiction to hear the appeal.

77.     On November 15, 2012, Chicago Title paid a final judgment of over $51 million, reflecting the amount of the jury verdict, plus post-judgment interest.

78.     Together with defense costs, the total loss was $54,295,754.69 (the "Abengoa Loss").

### (The Abengoa Loss Is A Covered Loss Under The MPL Policies)

79.     The Abengoa Matter and the resultant Abengoa Loss satisfy the "wrongful act" definition element in the MPL Policies.

80.     The MPL Policies provide coverage for, among other things, "negligent acts, errors and omissions" and Chicago Title was sued for and ultimately found liable in negligence.

81.     By letter dated May 25, 2011, National Union admitted that the Abengoa Matter satisfied the "wrongful act" element.

82.     It is the Defendants' burden to prove the applicability of any exclusions.

83.     The only exclusion raised by the Defendants has been Exclusion (O), as amended by Endorsement #20 in the MPL Primary Policies.

84.     The Defendants have since abandoned reliance on Exclusion (O).

85.     Even if the Defendants are still relying on Exclusion (O), it does not apply.

86.     Exclusion (O) precludes coverage for claims:

   alleging, arising out of or resulting, directly or indirectly, from any guarantee or express warranty; inaccurate, inadequate, or incomplete

15

description of the price of goods, products or services; or any failure of goods, products or services to conform with an advertised quality or performance; or liquidated damages; or any failure to provide goods or products, or perform services within a specified time period, by a deadline or according to specified milestones; or the collection of or seeking the return of fees or royalties or other compensation paid to an insured; or your cost of providing, correcting or re-performing or completing any professional services; or any insured's fees, cost or profit guarantees, costs representations, contract price, or estimates of probable costs or cost estimates being exceeded.

87.     By letter dated November 15, 2012, and written by National Union but, upon information and belief, approved and/or ratified by the other Defendants, only the following language in Exclusion (O) was referenced: "alleging, arising out of or resulting, directly or indirectly, from any guarantee or express warranty . . . or any failure of goods, products or services to conform with an advertised quality or performance . . . or your cost of providing, correcting or re-performing or completing any professional services."

88.     The November 15, 2012 letter asserted that "[e]xclusions like these are designed to ensure that an insurer is only insuring against the risk of failing to meet a professional standard of care, rather than guaranteeing or warranting a particular result." In support of this position, National Union cited two cases, *City of Mounds View v. Walijarvi*, 263 N.W.2d 420 (Minn. 1978) and *Klein v. Catalano*, 386 Mass. 701 (1982).

89.     *Mounds* is not an insurance coverage case. It dealt with whether architects, and other vendors of professional services, could be sued, not on a negligence theory, but "by a rule which imposes implied warranty/strict liability." 263 N.W.2d at Syll. ¶3. Chicago Title was not sued for implied warranty/strict liability.

90.     *Klein* also is not an insurance coverage case. It involved the question of whether Massachusetts's statute of repose applied to claims asserted by a student, who was injured at a college's student-center building, against the architect of that building.

16

91.     Exclusion (O) does not exclude coverage for the Abengoa Loss because, among other things, Chicago Title was never sued for breach of express warranties or guarantees and was ultimately found liable in negligence.

92.     The part of Exclusion (O) precluding coverage for claims regarding "any failure of goods, products or services to conform with an advertised quality or performance" does not apply because the Abengoa Loss had nothing to do with "advertising".

93.     The part of Exclusion (O) precluding coverage for "your cost of providing, correcting or re-performing or completing any professional services" does not apply because the Abengoa Loss does not involve such cost.

**(Once The Abengoa Matter Was "First Made", It Was Timely Noticed Under The 2009-2010 MPL Tower And/Or The 2010-2011 MPL Tower)**

94.     As noted above, via Endorsement #10: (1) a claim is considered "first made" only when the applicable General Counsel, Risk Manager, or Chief Financial Officer, know of a claim; and (2) whether notice is thereafter required depends on these individuals' reasonable estimation of damages and claim expenses exceeding certain thresholds.

95.     This language in Endorsement #10 means that "when notice is required, is necessarily, a question of judgment.   It could not be otherwise." *Evanston Ins. Co. v. Stonewall Surplus Lies, Ins., Co.*, 111 F.3d 852, 860 (11th Cir. 1997).

96.     In exercising this judgment, "an insured is not required to conclude that a claim is 'reasonably likely' to produce a loss equal to [a] plaintiff's demand." *Id*. at 861, n. 9.

97.     FNF had in place reasonable procedures and protocols to ensure that claims would be appropriately escalated in due course to those individuals who had the insurance reporting obligations.

17

98.    The Abengoa Plaintiffs filed suit on July 25, 2008 (hereinafter the "Abengoa Complaint").

99.    Outside defense counsel (hereinafter "Outside Defense Counsel") was retained to represent Chicago Title in the Abengoa Matter.

100.    From July 25, 2008 to approximately March 2009, the Abengoa Matter was internally supervised by Nancy Beck ("Ms. Beck").  From approximately March 2009 to the end of 2009 / early 2010, the Abengoa Matter was internally supervised by Chris Conry ("Mr. Conry").  From the end of 2009 / early 2010 to approximately August 2010, the Abengoa Matter was internally supervised by John Benton ("Mr. Benton").  From approximately August 2010 to approximately January 2011, the Abengoa Matter was internally supervised by Kevin Vander Kolk ("Mr. Vander Kolk").  Ms. Beck and Messrs. Conry, Benton, and Vander Kolk will be collectively referred to as "the In-House Supervising Attorney(s)" unless otherwise noted.

101.    During all relevant times, the In-House Supervising Attorneys were not the General Counsel, Chief Financial Officer, or Risk Manager for FNF or for any insured.

102.    The Abengoa Complaint did not specify the amount of damages being claimed, other than claiming $65,000 in purported out-of-pocket expenses.

103.    In August 2008, Outside Defense Counsel advised that if an early settlement could not be reached, fees and costs through trial would exceed $50,000 to $60,000.

104.    In November 2008, Outside Defense Counsel advised the In-House Supervising Attorney that no documentation had been produced demonstrating the amount of damages.

105.    In July 2009, Outside Defense Counsel advised the In-House Supervising Attorney that other than vague, unsupported claims by counsel for the Abengoa Plaintiffs, no

18

information had been produced by the Abengoa Plaintiffs from which to know the extent of the damages they were claiming.

106.   In October 2009, Outside Defense counsel advised the In-House Supervising Attorney that the Abengoa Plaintiffs were to supplement their document production with documents that allegedly supported their claim for damages.  When the supplemental production occurred, however, it consisted primarily of documents from lawsuits various residents had brought in opposition to the Plant, thus showing, as Outside Defense Counsel further advised, that there would have been opposition to the building of the Plant regardless of whether Chicago Title missed any names in the Radius Search.

107.   In October 2009, Outside Defense Counsel submitted an updated budget to the In-House Supervising Attorney.  The total estimated budget through post-trial motions, and including possible expert fees, was $187,350.  That amount is more than $300,000 less than the bordereau reporting requirement in the MPL Policies.

108.   As of October 2009, the total amount of defense costs and expenses incurred in the defense of the Abengoa Matter was less than $50,000.

109.   On November 18, 2009, the 2009-2010 MPL Tower went into effect.

110.   On December 16, 2009, Outside Defense Counsel reported to the In-House Supervising Attorney that the Abengoa Plaintiffs had not produced their expert report, which was to lay out their claim and basis for damages, and that the Abengoa Plaintiffs had made no attempt to depose Chicago Title representatives regarding the Radius Search.

111.   In March 2010, Outside Defense Counsel reported to the In-House Supervising Attorney that: (1) limited support for any damage claim had been provided; (2) it was not likely that a court would find that Chicago Title's actions were the direct cause for the Abengoa

Plaintiffs' failure to build the Plant; and (3) the costs of litigation would likely surpass the amount of any damages. Outside Defense Counsel also recommended at this time that Chicago Title make a settlement offer between $500, the liability limit listed on the certificate, and $10,000.

112. In August 2010, Outside Defense Counsel reported to the In-House Supervising Attorney that not much activity had occurred in the Abengoa Matter and that based on an October 15, 2010 deadline for the Abengoa Plaintiffs to submit an expert report, deposing the Abengoa Plaintiffs' expert would give the first opportunity to explore the amount the Abengoa Plaintiffs were seeking in damages. At the end of August 2010, the total amount of defense costs and expenses incurred in the defense of the Abengoa Matter was approximately $85,000.

113. On November 4, 2010, the Abengoa Plaintiffs submitted a summary expert report. Upon its receipt, the In-House Supervising Attorney asked Outside Defense Counsel to provide an updated assessment.

114. In the meantime, a general departmental meeting (the "General Meeting") had been scheduled for November 11, 2010, the purpose of which was to have certain in-house supervising attorneys interface with other senior attorneys, including Gary Urquhart, who held the title of General Counsel for Chicago Title at that time.

115. During the General Meeting, the Abengoa Matter was briefly discussed, but the potential damages in the Abengoa Matter were not discussed and the In-House Supervising Attorney did not bring to the meeting a copy of the recently produced summary expert report.

116. On November 18, 2010, the 2010-2011 MPL Tower went into effect.

117. On December 21, 2010, the In-House Supervising Attorney received the requested updated case assessment from Outside Defense Counsel.

118.   At the end of December 2010, the total amount of defense costs and expenses incurred in the defense of the Abengoa Matter was less than $250,000.

119.   On January 4, 2011, the In-House Supervising Attorney submitted the December 2010 updated case assessment to a Clint Adams ("Mr. Adams").  During all relevant times, Mr. Adams was not the General Counsel, Chief Financial Officer, or Risk Manager for FNF or any insured.  Mr. Adams brought the Abengoa Matter to the attention of a Mr. Green, who works in FNF's Risk Management Department.  Mr. Green then brought the Abengoa Matter to the attention of FNF's Risk Manager, Kimberly Loverich, who then made the determination to provide notice.

120.   Prior to January 2011, FNF's Risk Manager was not aware of the Abengoa Matter, nor was FNF's Chief Financial Officer, nor was FNF's General Counsel.

121.   Pursuant to the long-standing custom and practice, FNF gave notice of the Abengoa Matter through the insurance broker, Willis of Florida, Inc. ("Willis").  This occurred on January 8, 2011.

122.   On January 11, 2011, Willis sent the notice to the Defendants, including providing a copy of the summary expert report.

123.   Notice was made under the 2009-2010 MPL Tower pursuant to the Post-Policy Reporting Period, but on or about February 4, 2011, National Union claimed that "Fidelity cannot utilize this provision as the matter was not reported within sixty (60) days after the date the claim was made (August 2008)."  Upon information and belief, the other Defendants agreed with, or ratified, this position National Union asserted.

124.   The Defendants' February 4, 2011 position is directly contradictory to the plain and unambiguous language set forth in Endorsement #10 of the MPL Policies.  As set forth

above, a claim is not "first made" under the MPL Policies simply when a complaint is filed. Instead, the applicable General Counsel, Risk Manager, or Chief Financial Officer must first know of a claim and then have the opportunity to reasonably estimate what total damages and expenses would be to see if the reporting thresholds are met.

125.    The Defendants now claim, however, that the Post-Policy Reporting Period does not apply because the: (1) "trigger date" was the date of the General Meeting, *i.e.*, November 11, 2010; and (2) because Endorsement #10 states that a claim may be reported "within sixty (60) days after the end of the **policy period**, <u>as long as such **claim**(s) is reported no later than sixty (60) days after the date of such claim was first made against you</u>." (Underline emphasis added). Sixty-days from November 11, 2010, is January 10, 2011. Thus, the Defendants are now claiming that the January 11, 2011 notice under the Post-Policy Reporting Period was late by less than 24-hours.

126.    Even if the language "as long as such claim(s) is reported no later than sixty (60) days after the date of such claim was first made against you" is enforceable (which it is not) and stands for the proposition the Defendants assert (which it does not), a delay of less than 24-hours in reporting does not constitute prejudice as a matter of law.

127.    In this regard, the Defendants cannot rely on the rule that under a "claims-made-and-reported" policy, there is no coverage for a claim reported outside of the policy period even if the insurer suffered no prejudice. The underlying rationale for this rule is that an insurer is entitled to "close its books" on a claims-made-and-reported policy once it expires. However, given the Post-Policy Reporting Period, the "book" on the 2009-2010 MPL Tower could not close until January 17, 2011, at 12:01 AM Eastern. In contrast, the Defendants received notice of the Abengoa Matter no later than January 11, 2011.

22

128.    Thus, the prejudice rule applies and the Defendants suffered no prejudice, and cannot show prejudice, for a notice that is purportedly "late" by less than twenty-four hours.

129.    In fact, the Defendants have waived the "coverage defense" of prejudice and untimely notice.

130.    Under Florida law, a "coverage defense" is defined as a defense to coverage which, but for some breach of condition, otherwise exists.

131.    Examples of a "coverage defense" include lack of timely notice and a claim of prejudice from untimely notice.

132.    Pursuant to Fla. Stat. § 627.426(2), a liability insurer is not permitted to deny coverage based on a "coverage defense" unless, "within 30 days after the liability insurer knew or should have known of the coverage defense" written notice of that coverage defense is given to the insured.   If an insurer fails to provide such written notice within the requisite time period, the coverage defense is waived.

133.    Fla. Stat. § 627.426(2) applies to excess carriers and, thus, applies to Beazley, Indian Harbor, National Union in its capacity as excess carrier, Illinois National, and Ironshore.

134.    As noted, the Defendants were on notice of the Abengoa Matter no later than January 11, 2011, and by February 4, 2011, had taken the incorrect position that the Abengoa Matter was first made in August 2008.  Yet, it was not until May 25, 2011, more than 30 days after January 11, 2011, that National Union even issued a reservation of rights letter which asserted the prejudice / lack of timely notice coverage defense.

135.    Furthermore, the Defendants actually received notice of the Abengoa Matter on January 8, 2011.  That is the date that FNF asked Willis to provide notice to the Defendants. While the general rule is that an insurance broker is an agent of the insured, insurance brokers

often have dual roles.  In this regard, it was custom and practice in the industry and in the

relationship FNF had with the Defendants relative to the MPL Program, for all communications

to go through Willis with regard to notice and handling of claims.

136.    In any event, because it was not until January 2011 that any applicable General

Counsel, Risk Manager, and/or Chief Financial Officer was aware of the Abengoa Matter and

had the opportunity to make a reasoned judgment about total damages and expenses, the

Abengoa Matter was also timely noticed under the 2010-2011 MPL Tower.

137.    As of January 11, 2011, both the 2009-2010 MPL Tower, through its Post-Policy

Reporting Period, and the 2010-2011 MPL Tower were in effect.

138.    Endorsement #10 further provides, in pertinent part:

> Notwithstanding the foregoing, if we determine that your failure to
> comply with any of the notice requirements described in subparagraphs
> (2), (3), or (4) above in connection with any claim is **due solely to the fact
> that damages and claim expenses are not reasonably estimated by any
> of those individuals to exceed $500,000, and you subsequently provide
> written notice to us**, coverage may be available under this policy subject
> to all other terms, conditions and exclusions to this policy provided that:
>
>> a.  *there is at the time such claim is noticed to us an effective
>>     Miscellaneous Professional Liability Policy issued by us
>>     to the named insured providing the same or similar
>>     coverage*; and
>>
>> b.  there has not been, in our opinion acting in good faith, any
>>     prejudice to us in connection with such claim by reason of
>>     your late notification.
>
> We may in our sole discretion, however, deem any such claim as being
> properly submitted under either this policy or any policy in place that
> satisfies the condition in subparagraph 5(a) above.

(MPL Primary Policies at Endorsement #10) (emphasis added).

139.    Accordingly, because of the language in Endorsement #10 quoted above in

Paragraph 138 and because, as of January 11, 2011, both the 2009-2010 MPL Tower and the

2010-2011 MPL Tower were in effect, the Defendants could deny coverage for the Abengoa Matter for "late notice" only if they concluded, in good faith, to have suffered prejudice. Consequently, there is no presumption of prejudice, the Defendants cannot prove prejudice, and have, in any event, waived the late notice / prejudice coverage defense, for the reason explained above in Paragraphs 129-134.

140.   The Eleventh Circuit has also held, in a situation where an insured gave notice just hours after one claims-made policy had expired but had renewed coverage with the same carrier, that it would be "both illogical and inequitable to deny coverage to the insured who chooses to renew its claims-made policy for successive years with the same insurer . . . ." *Cast Steel Products, Inc. v. Admiral Ins. Co.*, 348 F.3d 1298, 1303-1304 (11th Cir. 2003) (applying Florida law).

141.   The same rationale in *Cast Steel* applies here even in more force given the language of Endorsement #10 set forth in Paragraph 138, given that FNF renewed its 2009-2010 MPL Tower with the same insurers for the 2010-2011 time period, and given that at the time the Abengoa Matter was noticed, whether it be January 8 or January 11, 2011, both MPL Towers were in effect.

**(All Other Pre-Conditions For Coverage Have Been Satisfied)**

142.   Any and all other pre-conditions to coverage, including satisfaction of the $5 million retention, have been satisfied.

143.   The Defendants, however, have raised a coverage defense regarding lack of cooperation.

144.   The Defendants have contended that Chicago Title abrogated the Defendants' purported subrogation rights against Kansas Secured for its involvement in the Radius Search.

145.    Even assuming that the Defendants have also not waived this particular coverage defense, the Defendants were previously informed that, after further investigation by Outside Defense Counsel, Kansas Secured had done nothing wrong in regard to the Radius Search.

146.    There is no viable subrogation claim against Kansas Secured.

147.    The Defendants also contend Chicago Title failed to cooperate relative to a strategic decision made during the course of the Abengoa Matter.

148.    In particular, because Chicago Title determined that it had in fact made a mistake and that Kansas Secured could not be blamed, Chicago Title would admit that it made a mistake (the "Admission") and focus its defense on causation issues and the limitation of liability provision.

149.    In early May 2011, Chicago Title invited all of the Defendants to participate on a call regarding the defense of the Abengoa Matter (the "May 2011 Call"), but only National Union attended.

150.    Chicago Title advised National Union of the Admission strategy during the May 2011 Call.  National Union did not object during that call.  Chicago Title then filed the appropriate papers with the court to effect that Admission strategy.

151.    The Defendants now claim that Chicago Title failed to cooperate, and violated a provision in the MPL Policies that provides that:

> **The insured shall not admit or assume any liability**, enter into any settlement agreement, stipulate to any judgment or incur any claim expense without our prior written consent . . . . Only those settlements, stipulated judgments and claim expenses which we have consented to shall be recoverable as loss under the terms of this policy.

(Primary MPL Policies at Endorsement #9) (emphasis added).

26

152. Under Florida law, an insurer may deny coverage based on the insured's failure to cooperate only if: (1) the lack of cooperation was material, (2) the insurer exercised diligence and good faith in bringing about the cooperation of its insured and itself complied in good faith with the terms of the policy, and (3) the lack of cooperation substantially prejudiced the insurer. The Defendants cannot meet this standard.

153. There was no lack of cooperation. National Union was advised of the Admission strategy, whereas the other Defendants chose not to attend the May 2011 Call.

154. The Defendants did not exercise diligence and good faith relative to any alleged purported lack of cooperation. The time to raise an objection to the Admission strategy was on the May 2011 Call, not after Chicago Title advised of the strategy, heard no objection, and then proceeded.

155. The Defendants suffered no actual prejudice as a result of the Admission. Chicago Title simply admitted to an indisputable fact. It would be against public policy if an insured lost coverage for being truthful.

156. Additionally, the purpose of this type of cooperation clause is to prevent collusion between an insured and a claimant against the insured's insurer.

157. There was no collusion between Chicago Title and the Abengoa Plaintiffs.

158. Additionally, the MPL Policies provide that: "You shall take such actions which, in your judgment, are deemed necessary and practicable to prevent or limit loss arising from your wrongful acts." (MPL Primary Policies, § VI. B. 2.).

159. The Admission was deemed necessary to help limit loss. Indeed, National Union admitted, in writing by letter dated August 5, 2011, that in deciding to make the Admission, Chicago Title was making a decision that Chicago Title thought was in its best interests for trial.

**(The Defendants Misuse The "Other Insurance" Provision)**

160.    The MPL Primary Policies contain an "other insurance" provision (hereinafter "the Other Insurance Clause"), which reads, in relevant part, as follows: "Such insurance as is provided by this policy shall be excess of any other valid and collectible insurance available to you . . . ." (2009-2010 Primary MPL Policy, at Endorsement #32; 2010-2011 Primary MPL Policy, at Endorsement #31).

161.    The Other Insurance Clause is not a condition to coverage and only applies in the situation where there are concurrent insurance policies at the same level providing coverage for the same risk.

162.    The Defendants bear the burden of proving the applicability of the Other Insurance Clause.

163.    An insurer cannot use an "other insurance" clause to deny coverage to its insured.

164.    The Defendants contend that the Reinsurance Contract constitutes "other insurance" that falls within the Other Insurance Clause.

165.    More specifically, the Defendants contend that following the satisfaction of the $5 million retention, the MPL Policies sit excess to the Reinsurance Contract for losses beyond $5 million.

166.    Under the Defendants' contention, following the satisfaction of the $5 million retention under the MPL Primary Policies, FNF has only one insurance tower that effectively looks as depicted in the chart that follows:

28

| The Defendants Single Insurance Tower Theory | |
|---|---|
| Carrier / Policy | Policy Limit Per Claim |
| National Union as MPL Primary | $5,000,000 |
| First Layer of Reinsurance Contract | $10,000,000 |
| Second Layer of Reinsurer Contract | $30,000,000 |
| Third Layer of Reinsurance Contract | $50,000,000 |
| Second Excess of Loss Reinsurance Contract | $300,000,000 |
| National Union as MPL Primary again | $10,000,000 |
| Beazley as First Excess MPL Carrier | $15,000,000 |
| Indian Harbor as Second Excess MPL Carrier | $10,000,000 |
| Illinois National and/or National Union as Third Excess MPL Carrier | $10,000,000 |
| Ironshore as Fourth Excess MPL Carrier | $10,000,000 |

167.    FNF paid millions in premiums to the Defendants based on a $60 million tower of

insurance following satisfaction of a $5 million self-insured retention, as the following reflects:

| Actual MPL Tower Programs | | | | |
|---|---|---|---|---|
| Carrier | Policy Limit | | Gross Premium | |
| | 2009-2010 MPL Tower | 2010-2011 MPL Tower | 2009-2010 MPL Tower | 2010-2011 MPL Tower |
| Ironshore – 4th Excess | $10 Million | $10 Million | $675,000 | $430,000 |
| National Union / Illinois National - 3rd Excess | $10 Million | $10 Million | $780,00 | $570,000 |
| Indian Harbor - 2nd Excess | $10 Million | $10 Million | $828,750 | $710,000 |
| Beazley - 1st Excess | $15 Million | $15 Million | $2,040,262 | $2,067,262 |
| National Union - Primary | $12,057,548.68[2] | $15 Million | $2,700,000 | $2,480,000 |
| FNF Self-Insured Retention - $5 Million | | | | |

Yet, under the Defendants' theory, FNF agreed to pay them the exact same premiums based on a

$450 million tower of insurance, as reflected by the following chart:

---

[2] As noted previously, while the 2009-2010 Primary MPL Policy had a $15 million aggregate and per claim limit, National Union paid on another claim, thereby reducing the available policy limit under the 2009-2010 Primary MPL Policy to the number indicated.

| The Defendants' Single Insurance Tower Theory | | | | |
|---|---|---|---|---|
| Carrier | Policy Per Claim Limit | | Gross Premium | |
| | 2009-2010 Tower | 2010-2011 Tower | 2009-2010 Tower | 2010-2011 Tower |
| Ironshore – 4th Excess | $10 Million | $10 Million | $675,000 | $430,000 |
| National Union / Illinois National - 3rd Excess | $10 Million | $10 Million | $780,000 | $570,000 |
| Indian Harbor - 2nd Excess | $10 Million | $10 Million | $828,750 | $710,000 |
| Beazley - 1st Excess | $15 Million | $15 Million | $2,040,262 | $2,067,262 |
| National Union - Primary | $12,057,548.68 | $10 Million | $2,700,000 | $2,480,000 |
| Second Excess of Loss Reinsurance Contract | $300 Million | $300 Million | To Be Disclosed Confidentially | To Be Disclosed Confidentially |
| First Excess of Loss Reinsurance Contract | $90 Million | $90 Million | To Be Disclosed Confidentially | To Be Disclosed Confidentially |
| National Union - Primary | $5 Million | $5 Million | $2,700,000 | $2,480,000 |
| FNF Self-Insured Retention - $5 Million | | | | |

168.   Under the Defendants' theory, unless FNF suffered a loss in excess of $400 million, FNF would never be able to access the full limits of National Union's Primary MPL Policies, nor the MPL Excess Policies, and the duty to defend under the MPL Policies would be "interrupted" when a loss – which includes defense expenses – exceeds $5 million.


[Remainder Of Page Intentionally Left Blank]

169.    The Defendants are taking a position that is at odds with the policy terms and any common sense business understanding of the purpose and costs the policies.  No reasonable insurer would charge – and no reasonable insured would accept – the premiums for the "program" the Defendants now advance.[3]

**(While The Defendants Refused To Pay Anything, Certain Subscribing Reinsurers Paid On The Abengoa Loss)**

170.    FNF also noticed the Abengoa Matter under the Reinsurance Contract.

171.    Relative to the Abengoa Loss, the following Subscribing Reinsurers paid, without issuing a reservation of rights, in the following amounts:

| Reinsurers Paying Without Reservation of Rights | |
|---|---|
| Reinsurer | Amount |
| Axis Specialty Limited | $7,144,363.20 |
| Allianz Risk Transfer AG | $1,771,830.19 |
| XL Re Ltd. | $1,489,963.44 |
| | Total: $10,406,156.83 |

172.    Relative to the Abengoa Loss, the following Subscribing Reinsurers have asserted reservation of rights in regard to the amounts they paid.  The amount each such Subscribing Reinsurer paid is as reflected in the chart that follows:

---

[3] This exemplifies the bad-faith conduct FNF has been forced to endure at the hands of the Defendants. Accordingly, at the appropriate time and consistent with Florida law, FNF will seek leave to amend this Complaint to assert its statutory bad-faith claim under Fla. Stat. § 624.155.

| Reinsurers Paying With Reservation of Rights | |
|---|---|
| **Reinsurer** | **Amount** |
| Aspen Insurance UK Limited | $2,074,915.10 |
| Hannover Ruckversicherung AG | $3,773,235.85 |
| Lexington Insurance Company | $757,745.28 |
| Certain Underwriters of Lloyd's London, Syndicate #2987 (BRIT) | $4,416,075.47 |
| Certain Underwriters of Lloyd's London, Syndicate #0033 (HIS) | $3,311,981.60 |
| Certain Underwriters of Lloyd's London, Syndicate #0435 (FDY) | $996,700 |
| Certain Underwriters of Lloyd's London, Syndicate #0570 (ATR) | $624,100 |
| Certain Underwriters of Lloyd's London, Syndicate #0780 (ADV) | $1,335,412.03 |
| Certain Underwriters of Lloyd's London, Syndicate #0958 (GSC) | $900,351.41 |
| Certain Underwriters of Lloyd's London, Syndicate #1458 (RNR) | $672,181.60 |
| Certain Underwriters of Lloyd's London, Syndicate #2003 (SJC) | $4,201,287.73 |
| Certain Underwriters of Lloyd's London, Syndicate #0623 (Beazley) | $5,129,400 |
| Certain Underwriters of Lloyd's London, Syndicate #2623 (Beazley) | $1,203,200 |
| | Total: $29,396,586.17 |

173.    One of the Subscribing Reinsurers, (Validus Re), refused to pay and that refusal is now subject to a pending arbitration proceeding (the "Validus Arbitration").

174.    In all, FNF received $39,802,742.90 under the Reinsurance Contract from those Subscribing Reinsurers that paid (the "Paying Reinsurers"). However, $5,467,587.50 of that amount was paid back to the Paying Reinsurers as a "reinstatement fee" for the Reinsurance Contract to continue in force at its full coverage limit (the "Reinstatement Fee").

32

**(FNF Has Not Been Made Whole And Has Suffered Consequential Damages As A Result Of The Defendants' Conduct)**

175.   FNF is not seeking a "double recovery".

176.   Even assuming that the Defendants would be entitled to off-set what FNF recovered under the Reinsurance Contract, FNF has not been made whole and, less the $5 million retention, there remains $9,493,011.79 in unreimbursed losses, plus interest.

177.   Furthermore, given the Validus Arbitration and the fact that certain reinsurers have asserted a reservation of rights, FNF's loss is subject to being increased by over $29 million.

178.   FNF should have never been forced into this position by the Defendants.

179.   Indeed, the Defendants were required to pay to FNF the entirety of the Abengoa loss (less the $5 million retention), after which it could consider whatever equitable subrogation and/or contribution rights they believed they might have against the Reinsurers.

180.   Since the Defendants have refused to honor their contractual obligations, FNF was required to access the Reinsurance Contract and were forced to incur additional expenses that could have been avoided but for the Defendants' conduct.  These additional expenses include the Reinstatement Fee.

**(Chicago Title And The Paying Reinsurers Are Not Necessary Parties To This Lawsuit)**

181.   Chicago Title is not a party to this lawsuit because the MPL Policies provide, and the custom and practice is that, FNF acts on its behalf with regard to insurance risk management matters.

182.   Moreover, Chicago Title agreed that FNF act on its behalf relative to insurance coverage matters.

183.    The Paying Reinsurers are not a party to this lawsuit because FNF is obligated to pursue all reasonable recovery efforts and is acting on the Paying Reinsurers behalf in this lawsuit.

184.    Furthermore, FNF is not seeking, nor would it be receiving a windfall, because when a reinsured brings an action such as this, recoveries are to be held in trust for the reinsurer.

**(The Defendants Mediate In Bad Faith)**

185.    The MPL Polices require that before commencing a lawsuit the parties must first engage in Alternative Dispute Resolution, in the form of either non-binding mediation or a binding arbitration.  (2009-2010 Primary MPL Policy, at Endorsement #30; 2010-2011 Primary MPL Policy, at Endorsement #29).

186.    The MPL Policies further require that FNF, as the named insured, "shall act on behalf of each and every insured in deciding to proceed with an ADR process". (*Id.*)

187.    If mediation is selected, there is a further requirement that no judicial proceeding be brought until 120 days after the mediation is terminated.  (*Id.*)

188.    The MPL Policies specifically state that if mediation is selected, both the parties "shall try in good faith to settle the dispute . . . ." (*Id.*)

189.    FNF commenced mediation in February 2013.

190.    A mediation session was held on June 26, 2013 (the "June 26 Mediation Session").  A second, failed meeting occurred on September 26, 2013.

191.    The Defendants breached their specific contractual obligation to mediate in good faith.  Accordingly, any alternative dispute resolution pre-condition to filing suit cannot be

34

enforced by the Defendants.  In any event, this lawsuit has been commenced 120 days after the conclusion of the September 26 meeting.[4]

## COUNT ONE
### (Breach of Contract)

192.   FNF hereby incorporates as if fully rewritten herein, Paragraphs 1 – 191, above.

193.   The MPL Policies attached as Exhibit A – J are valid and enforceable contracts.

194.   FNF has fully performed its obligations under the MPL Policies and all necessary pre-conditions to bring suit have been satisfied.

195.   Without justification or excuse, the Defendants have breached their obligations under the MPL Policies, including by failing to pay the full amount of – or a part of – the Abengoa Loss.

196.   As a result of the Defendants' breach, FNF has been damaged in amounts depending on the resolution of certain other related issues.  In particular, but subject to amendment and/or modification:

(a)   If the Abengoa Loss is treated as being covered under the 2009-2010 MPL Tower and the Paying Reinsurers are secondarily liable, then the Defendants are liable as follows:

National Union:   $12,057,548.68, plus attorney fees pursuant to Florida Statue § 627.428, plus pre-judgment interest, plus consequential damages.

Beazley:   $15 million, plus attorney fees pursuant to Florida Statue § 627.428, plus pre-judgment interest, plus consequential damages.

---

[4] Because the Defendants may argue that the facts showing why they mediated in bad faith are confidential given that they occurred in the context of a confidential mediation, those facts are not set forth herein.  The Defendants, however, are well aware of FNF's position.  But if the Defendants should contend that the pre-suit mediation condition has not been satisfied, then FNF will consider the Defendants to have waived confidentiality by placing their conduct at issue and will provide the Court with the details of the Defendants' failure to mediate in good faith.

| | |
|---|---|
| Indian Harbor: | $10 million, plus attorney fees pursuant to Florida Statue § 627.428, plus pre-judgment interest, plus consequential damages. |
| Illinois National: | $10 million, plus attorney fees pursuant to Florida Statue § 627.428, plus pre-judgment interest, plus consequential damages. |
| Ironshore: | $2,148,206.01, plus attorney fees pursuant to Florida Statue § 627.428, plus pre-judgment interest, plus consequential damages. |

(b)   If the Abengoa Loss is treated as being covered under the 2010-2011 MPL Tower and the Paying Reinsurers are secondarily liable, then the following Defendants are liable as follows:

| | |
|---|---|
| National Union: | $15 million, plus attorney fees pursuant to Florida Statue § 627.428, plus pre-judgment interest, plus consequential damages. |
| Beazley: | $15 million, plus attorney fees pursuant to Florida Statue § 627.428, plus pre-judgment interest, plus consequential damages. |
| Indian Harbor: | $10 million, plus attorney fees pursuant to Florida Statue § 627.428, plus pre-judgment interest, plus consequential damages. |
| National Union: | $9,205,754.69, plus attorney fees pursuant to Florida Statue § 627.428, plus pre-judgment interest, plus consequential damages. |

(c)   If the Paying Reinsurers are primarily liable then, whether the Abengoa Loss is treated as being covered under the 2009-2010 MPL Tower or the 2010-2011 MPL Tower, National Union as the primary MPL carrier is liable for breach of contract in the amount of $9,493,011.79, pre-judgment interest, and attorney fees pursuant to Florida Statue § 627.428.

36

(d) If the Paying Reinsurers and the Defendants are found to have a common obligation, then whether the Abengoa Loss is treated as being covered under the 2009-2010 MPL Tower or the 2010-2011 MPL Tower, National Union as the primary MPL carrier is liable in an amount not less than $5 million and the remaining Defendants' will be liable based on the equitable contribution method this Court adopts, plus (as it regards all of the Defendants) pre-judgment interest, attorney fees pursuant to Florida Statute § 627.428, and consequential damages.

(e) If as a result of the Validus Arbitration, FNF must repay all the Subscribing Reinsurers which asserted a Reservation of Rights, then under the 2009-2010 MPL Tower, the following Defendants are liable for breach of contract as follows:

| | |
|---|---|
| National Union: | $12,057,548.68, plus attorney fees pursuant to Florida Statue § 627.428, plus pre-judgment interest, plus consequential damages. |
| Beazley: | $15 million, plus attorney fees pursuant to Florida Statue § 627.428, plus pre-judgment interest, plus consequential damages. |
| Indian Harbor: | $10 million, plus attorney fees pursuant to Florida Statue § 627.428, plus pre-judgment interest, plus consequential damages. |
| Ironshore: | $1,832,049.28, plus attorney fees pursuant to Florida Statue § 627.428, plus pre-judgment interest, plus consequential damages. |

(f) If as a result of the Validus Arbitration, FNF must repay all the Subscribing Reinsurers which paid under a Reservation of Rights, then under the 2010-2011 MPL Tower, the following Defendants are liable for breach of contract as follows:

| | |
|---|---|
| National Union: | $15 million, plus attorney fees pursuant to Florida Statue § 627.428, plus pre-judgment interest, plus consequential damages. |

| Beazley: | $15 million, plus attorney fees pursuant to Florida Statue § 627.428, plus pre-judgment interest, plus consequential damages. |
| Indian Harbor: | $8,889,597.96, plus attorney fees pursuant to Florida Statue § 627.428, plus pre-judgment interest, plus consequential damages. |

## COUNT TWO
### (Declaratory Judgment)

197.    FNF hereby incorporates as if fully rewritten herein, Paragraphs 1 - 196, above.

198.    There is a real, immediate, substantial and present controversy between parties having adverse legal interests that is ripe for, and requires, resolution. As set forth above, the Defendants have refused to provide coverage under the MPL Policies for the Abengoa Loss and have inappropriately relied on the Other Insurance Clause in an attempt to materially and fundamentally alter the MPL Programs as they were actually intended as evidenced by the MPL Policies themselves and the parties' conduct during the placement of those policies.

199.    Pursuant to 28 U.S.C. §§ 2201 and 2202, and Rule 57 of the Federal Rules of Civil Procedure, this Court may therefore – and should – declare that:

- the Abengoa Matter was timely noticed under the 2009-2010 MPL Tower, pursuant to the Post-Policy Reporting Period;
- the Abengoa Matter was timely noticed under the 2010-2011 MPL Tower;
- the parties did not intend to be any gaps in coverage between successively renewed policies such as was the case with the 2009-2010 MPL Tower and the 2010-2011 MPL Tower;
- the Defendants suffered no prejudice from the timing of the notice of the Abengoa Matter;
- the Defendants waived any coverage defense regarding late notice / prejudice and any other coverage defense it may now attempt to raise;
- FNF did not fail to cooperate regarding the defense of the Abengoa Matter;
- the Defendants do not have any subrogation rights in light of their refusal to pay on the Abengoa Loss;

38

- to the extent the Defendants have any subrogation rights, no such rights have been abrogated;
- the Abengoa Loss satisfies the MPL Policies' Insuring Agreements;
- the MPL Policies' exclusions do not apply to the Abengoa Loss; the Reinsurance Contract and Reinsurance Program do not constitute "other insurance" under the MPL Policies' Other Insurance Clause;
- as between the Paying Reinsurers and the Defendants, the Defendants are primarily liable for the Abengoa Loss;
- the Other Insurance Clause cannot be used to deny coverage for any part of the Abengoa Loss;
- even if the Reinsurance Contract is subject to the Other Insurance Clause (which it is not), that portion of the Abengoa Loss that Validus refused to pay under the Reinsurance Contract is not valid and collectible other insurance; and
- the Defendants mediated in bad faith.

## COUNT THREE
### (Reformation – Asserted In The Alternative)

200.    FNF hereby incorporates as if fully rewritten herein, Paragraphs 1 - 199, above.

201.    Relative to defining when a claim is "first made", Endorsement #10 of the Primary MPL Policies provides, as noted previously, that a claim will be considered as being "'first made' at such time that the claim is known by **your** General Counsel, Risk Manager or Chief Financial Officer." (bold in the original).

202.    Endorsement #16 of the Primary MPL Policies defines "your", in part, as follows: "the named insured . . . any subsidiary of the named insured . . . . any past, present or future officer, director, trustee or employee of the named insured or subsidiary . . . any entity whom the named insured or subsidiary is required by contract to add as an insured . . . and any independent contractor . . . ."

203.    The Defendants contend that the term "your" modifies the terms "General Counsel, Risk Manager, or Chief Financial Officer" such that a claim would be considered first made if known by any insureds' General Counsel, Risk Manger, or Chief Financial Officer.

204.    At a minimum, however, there is an ambiguity because General Counsel, Risk Manager or Chief Financial are all defined singularly and not in the plural.  This indicates that it was the intent of the parties that only a single entity's General Counsel, Risk Manager, or Chief Financial would be responsible for determining when a claim should be noticed.

205.    This intent is also supported by the custom and practice and manner in which reporting of other claims and quarterly bordereau reports were carried out under the MPL Program in that it was and is FNF's Risk Management Department, under the direction of FNF's Risk Manager, that coordinated all such reports, which National Union accepted.

206.    Prior to the placement of the MPL Policies, FNF described the internal claim escalation process used for FNF and its subsidiaries in a presentation to potential market participants, including the Defendants.  The Defendants thus understood that FNF utilizes a centralized function given the many subsidiaries FNF owns.

207.    Given the above, including the singular use of the terms of General Counsel, Risk Manager, and Chief Financial Officer, the proper interpretation is that for claim reporting obligations, it is only FNF's General Counsel, Risk Manager, or Chief Financial Officer whose knowledge counts.

208.    Alternatively, however, and to the extent necessary, Endorsement #10 should be reformed to read that a claim is considered first made if "at such time that the claim is known by **the named insured's** General Counsel, Risk Manager or Chief Financial Officer."

209.    In this regard, the word "your" was used due to a mutual mistake when – as evidenced by the singular version of the words General Counsel, Risk Manager, and Chief Financial Officer – the intent was to refer to FNF's General Counsel, Risk Manager, and Chief Financial Officer since FNF is the Named Insured, is the only entity that the Defendants

negotiate with in placement of the MPL Policies, that pays the premiums, that handles and coordinates all insurance recovery efforts, and that is expected to act on behalf of all other insureds as evidenced by certain provisions in the MPL Policies.

210. To the extent, however, the Defendants disclaim a mutual mistake, then there was a unilateral mistake on the part of FNF and inequitable conduct on the part of the Defendants.

211. Given the manner in which FNF internally handles claims, a process by which the Defendants have always been aware, it was not the intent of FNF to agree to a reporting structure that would cause a claim to be considered "first made" based on the knowledge any insureds' General Counsel, Risk Manager, or Chief Financial Officer, especially when not all insureds necessarily have a "General Counsel, Risk Manager, or Chief Financial Officer." Indeed, while "a past, present, or future officer, director, trustee, or employee" would be an insured, they do not personally have a General Counsel, Risk Manager, or Chief Financial Officer.

212. National Union has always accepted notice of claims, bordereau reports, notice of circumstances, and all other forms of communications relative to any pending claims coming solely from FNF, as opposed to all the other insureds. The other Defendants are aware of this fact and it is only now, in the effort to deny a claim, that the Defendants' claim departments seek to change the rules for the mere expediency of denying a covered claim.

### COUNT FOUR
**(Equitable Subrogation Or Equitable Contribution For All Paying Reinsurers)**

213. FNF hereby incorporates as if fully rewritten herein, Paragraphs 1 - 212, above.

214. FNF suffered a loss for which the Defendants are liable because the Defendants are legally responsible to FNF for the Abengoa Loss.

215.    The Paying Reinsurers have compensated FNF in part for the same loss for which the Defendants are primarily liable.

216.    The Defendants, and not the Paying Reinsurers, are primarily liable because, among other things: (1) the MPL Policies are liability policies providing coverage for the risk that FNF may be sued and held legally liable, whereas while the Reinsurance Contract also provides coverage for the Abengoa Loss, it is a contract of indemnity wherein the reinsurers liability follows both the fortunes and settlements of its reinsured; (2) the MPL Policies have a duty to defend, whereas the Reinsurance Contract does not; (3) the MPL Policies are triggered first upon satisfaction of a $5 million retention, as opposed to a $10 million retention; (4) the MPL Excess Policies are written specifically excess of the MPL Primary Policies, whereas the Reinsurance Contrast is not so written; (5) the MPL Policies were not underwritten with the thought they would be excess of the Reinsurance Program; (6) the premiums charged for the MPL Policies are not consistent with the Defendants' theory that its policies are excess of the Reinsurance Program; and (7) reinsurance is not "other insurance" as that phrase is understood in the industry. *See e.g.*, *Stonewall Ins. Co. v. Argonaut Ins. Co.*, 75 F. Supp. 2d 893, 908 (N.D. Ill. 1999) ("The primary mistake of most courts considering reinsurance issues is blindly applying principles of original insurance.").

217.    The Paying Reinsurers paid on the Abengoa Loss to protect its own interests under the Reinsurance Contract and not as a volunteer.

218.    Equity requires that the Abengoa Loss be entirely shifted from the Paying Reinsurers to the Defendants such that the Paying Reinsurers receive the collective amount of $39,802,742.90.

219.    In the alternative, to the extent the Defendants are not primarily liable for the loss, the Defendants and the Paying Reinsurers held a common obligation.

220.    Consequently, the Paying Reinsurers and the Defendants should share in the Abengoa Loss, but since the Defendants have not shared, this Court should order an equitable sharing it deems to be appropriate under the circumstances involved.

### Jury Trial Demand

FNF demands a trial by jury on all issues so triable.

WHEREFORE, having so pled, FNF prays as follows:

- For judgment against the Defendants on each of the Counts set forth above;
- Damages under the MPL Policies in an amount to be determined;
- Consequential damages in an amount to be determined;
- Pre-judgment interest;
- Costs of this action;
- Attorney fees pursuant to Florida Statute § 627.428
- For such other relief this Court deems equitable or appropriate.

Dated: January 24, 2014

Andrew Agati, Esq. (SBN# 4642955)
**HAHN, LOESER & PARKS LLP**
200 Public Square, Suite 2800
Cleveland, Ohio 44114
E-mail: aagati@hahnlaw.com
Telephone: (216) 274-2323
Fax:  (216) 274-2580

Samuel Sneed, Esq. (SBN# 4753216)
**HAHN, LOESER & PARKS LLP**
One America Plaza
600 West Broadway, Suite 1500
San Diego, CA 92101-3384
E-mail: ssneed@hahnlaw.com
Telephone: (619) 810-4340
Fax: (619) 810-4301

*Attorneys for Plaintiff Fidelity National Financial, Inc.*

43